UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| ERIC W. DREBES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:19 CV 59 ACL |
| | ) | |
| ANDREW SAUL, | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Plaintiff Eric W. Drebes brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Drebes' severe impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be reversed and remanded for further proceedings.

**I.  Procedural History**

Drebes filed his application for benefits on May 16, 2016, claiming that he became

unable to work on March 1, 2016.   (Tr. 156-57.)   In his Disability Report, Drebes alleged

disability due to cervical spine neuroforaminal stenosis, a mild thoracic disk bulge with

neuroforaminal stenosis, a disk herniation at L5-S1 with L5 nerve root impingement, nonspecific

brain lesions, depression, anxiety, headaches, neuropathy, chronic tinnitus, and paresthesias.

(Tr. 183.)   Drebes was 43 years of age at the time of his alleged onset of disability.   (Tr. 25.)

His application was denied initially.   (Tr. 85-89.)   Following an administrative hearing, Drebes'

claim was denied in a written opinion by an ALJ, dated October 31, 2018.   (Tr. 15-27.)   Drebes

then filed a request for review of the ALJ's decision with the Appeals Council, which was denied

on June 11, 2019.   (Tr. 1-3.)   Thus, the decision of the ALJ stands as the final decision of the

Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

    In this action, Drebes argues that the ALJ "erred in failing to give proper weight to

treating physician Dr. Gr[]eving's opinion."   (Doc. 12 at p. 7.)   He also contends that the ALJ

"erred in assessing the RFC."   *Id.* at 11.

## II.   The ALJ's Determination

    The ALJ first found that Drebes met the insured status requirements of the Social

Security Act through March 31, 2019.   (Tr. 17.)   She found that Drebes had not engaged in

substantial gainful activity since March 1, 2016, the alleged onset date.   *Id.*   In addition, the

ALJ concluded that Drebes had the following severe impairments: multiple sclerosis ("MS"),

degenerative disc disease of the lumbar spine, peripheral neuropathy, and headaches.   *Id.*   The

ALJ found that Drebes did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments.   (Tr. 19.)

    As to Drebes' RFC, the ALJ stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations. Pushing and pulling with both upper extremities is limited to frequently.   He can perform work with no climbing on ladders, ropes, or scaffolds and occasionally climbing on ramps or stairs, stooping, kneeling, crouching, and crawling.   He can occasionally reach overhead with both upper extremities.   He should avoid concentrated exposure to temperature extremes, vibration, and even moderate exposure to work hazards such as unprotected heights and being around dangerous moving machinery.

(Tr. 20.)

The ALJ found that Drebes was unable to perform any past relevant work, but was capable of performing other jobs existing in significant numbers in the national economy, such as office helper, mail clerk, and photocopy machine operator.   (Tr. 25-26.)   The ALJ therefore concluded that Drebes was not under a disability, as defined in the Social Security Act, from March 1, 2016, through the date of the decision.   (Tr. 27.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on May 16, 2016, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

*Id.*

# III.   Applicable Law

## III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted).  *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

**III.B.  Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner

looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b).  These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work."  *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to

determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id.*   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner

will find that the claimant is disabled.   20 C.F.R. §416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## IV.   Discussion

Drebes argues that the ALJ erred in discrediting the opinion of treating physician John Greving, D.O., and relying on the opinion of the non-examining state agency physician in determining Drebes' RFC.   He further argues that the RFC determined by the ALJ did not consider the combined effect of his impairments or the remitting/relapsing nature of MS.[1]

A claimant's RFC is the most an individual can do despite the combined effects of his or her credible limitations.   *See* 20 C.F.R. § 404.1545.   An ALJ determines a claimant's RFC "based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."   *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).   The ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports;" instead, the RFC assessment should include a narrative discussion demonstrating how the evidence logically supports the ALJ's conclusions.   *Strongson*, 361 F.3d at 1070.   "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."   *See Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).   There is no requirement, however, that an RFC finding be supported by a specific medical opinion.   *See Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v.*

---

[1]Although Drebes also alleged mental impairments, he does not challenge the ALJ's determination that these impairments are not severe.   The Court will therefore focus its discussion on Drebes' physical impairments.

*Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (An ALJ "is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.").

Dr. Greving, Drebes' treating internist since March 2016, provided opinions on two separate occasions.   On September 22, 2016, Dr. Greving completed a Residual Functional Capacity Form, in which he stated he saw Drebes every one-to-two months for symptoms of dizziness, numbness of the upper extremities, tingling in the feet, back pain, neck pain, and headaches.   (Tr. 270.)   In support of his opinions, Dr. Greving cited MRI findings of neuroforaminal stenosis of the cervical spine, a disc bulge with neuroforaminal stenosis in the thoracic spine, a herniation at L5-S1, and nonspecific lesions of the brain.   *Id.*   Dr. Greving expressed the opinion that Drebes could stand for less than one minute due to back pain and lower extremity pain and numbness; is able to sit with pain for less than six hours; needs to lie down during the day to relieve back pain; is only able to walk two to three feet before symptoms start; can rarely reach or handle; can lift or carry five to ten pounds occasionally and less than five pounds regularly; and is unable to bend, squat, kneel, or turn.   (Tr. 271-73.)   Dr. Greving indicated that he did not believe Drebes could work because he is unable to lift, pull, hold objects, bend, squat, or kneel.   (Tr. 274.)

Dr. Greving completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) on December 16, 2017, in which he expressed the opinion that Drebes could stand and walk less than two hours in an eight-hour day, sit less than two hours in an eight-hour day, sit fifteen minutes before changing position, stand five minutes before changing position, must walk around every 30 minutes for five minute periods, must shift at will from sitting or standing/walking, and needs to lie down at unpredictable intervals during an eight-hour shift.

(Tr. 574.)   He found that Drebes could never twist, stoop, crouch, climb, reach, handle, finger, feel, push, or pull.   (Tr. 575.)   Drebes must avoid even moderate exposure to extreme cold or heat and high humidity.   (Tr. 576.)   Dr. Greving found that Drebes would be off task twenty-five percent or more of the workday, would need to take six to ten unscheduled breaks lasting fifteen to twenty minutes during a workday, and would be absent from work more than four days per month due to his impairments.   (Tr. 576-77.)   As support for his opinions, Dr. Greving cited the findings from the spine and brain MRIs.   (Tr. 575-76.)

The ALJ indicated that she was assigning "little weight" to Dr. Greving's opinions.   (Tr. 24.)   The ALJ explained that, although Dr. Greving is a treating source, his opinions are not supported by his examination findings nor those of other providers, and his assessments appear extreme.   *Id.*   For example, she stated that Dr. Greving frequently found normal mental status, sensory, and motor function.   *Id.*   She indicated that other examiners also noted frequent normal examinations, including normal gait and station, intact sensation, full strength, and no functional loss due to his reported spasm or tremor.   *Id.*   Drebes' nerve conduction and EMG testing were also normal.   *Id.*   The ALJ found that there was no support for finding Drebes' impairments would cause excessive absenteeism, a need for breaks during the day, or an inability to sit, stand, or walk other than for short durations.   *Id.*

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians."   *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)).   The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."   *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000).

The record, though, should be "evaluated as a whole."   *Id.* at 1013 (quoting *Bentley v. Shalala,*
52 F.3d 784, 785-86 (8th Cir. 1997)).   The ALJ is not required to rely on one doctor's opinion
entirely or choose between the opinions.   *Martise,* 641 F.3d at 927.   Additionally, when a
physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion
can be of little evidentiary value.   *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012).
Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the
treating physician's opinion.   20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining
and treatment relationship between the claimant and the medical source, the length of the
treatment relationship and the frequency of examination, the nature and extent of the treatment
relationship, whether the physician provides support for his findings, whether other evidence in
the record is consistent with the physician's findings, and the physician's area of specialty.   20
C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

The ALJ provided sufficient reasons for assigning little weight to Dr. Greving's opinions.
The ALJ acknowledged that Dr. Greving was a treating physician.   She nevertheless determined
that the extreme limitations found by Dr. Greving were not supported by the medical evidence.
For example, Dr. Greving's own treatment notes reflect normal sensory and motor function, and
"normal extremities."   (Tr. 285, 289, 295, 299, 306, 372-73, 379, 414, 426, 442, 450, 625.)   Dr.
Greving did not explain how the objective evidence supported his specific limitations, and
merely cited to the MRI findings.   Additionally, other examiners documented a normal gait and
station, full muscle strength, and no focal deficits.   (Tr. 292, 302, 309, 311, 314, 322, 331, 342,
436, 460, 584, 609.)   With regard to Dr. Greving's statement that Drebes was unable to return to
work, the ALJ properly noted that this was a finding reserved for the Commissioner.   (Tr. 24,

274.)   In sum, Dr. Greving's treatment notes simply do not document findings that would support extreme limitations.   An ALJ does not err when she discounts a treating physician's medical opinion where the opined limitations stand alone and were never mentioned in the physician's numerous records of treatment.   *Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014); *see also Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015) (ALJ may discount treating provider's opinion when it is inconsistent with the provider's own treatment notes).

The ALJ next stated she was assigning "great weight" to the opinions of the state agency medical consultant, Kevin Threlkeld, M.D.   (Tr. 24.)   On January 30, 2017, Dr. Threlkeld expressed the opinion that Drebes could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; could never climb ladders or scaffolds; could occasionally stoop; could frequently climb ramps and stairs, balance, kneel, crouch, and crawl; was limited in his ability to reach, push, and pull; should avoid even moderate exposure to hazards; and should avoid concentrated exposure to extreme temperatures and vibration.   (Tr. 78-80.)    The ALJ stated that Dr. Threlkeld is an expert in disability evaluation and reviewed the records thoroughly.   (Tr. 24.)   She stated that Dr. Threlkeld's conclusions are supported by Drebes' spinal impairment, myriad of symptoms attributable to MS, headaches, and neuropathy.   *Id.*   The ALJ explained that the subsequent records reveal Drebes' eventual diagnosis of MS, but clinical findings have not changed significantly.   *Id.*   She stated that further reduction in RFC is not supported, as Drebes has normal ambulation with no need for assistive device, full range of motion, full strength, and intact reflexes and sensation.   *Id.*

Drebes argues that the ALJ erred in assigning great weight to Dr. Threlkeld's opinions, as he did not examine Drebes and he provided his opinion prior to his diagnosis of MS.   Drebes contends that the ALJ's RFC determination is not supported by substantial evidence.

By way of background, Drebes first underwent an MRI of the brain in approximately 2010, due to difficulty with headaches.  (Tr. 459).   That MRI was unremarkable.  *Id.*   Drebes started complaining of a burning sensation in the bilateral hands and feet in addition to the headaches in June 2016.  *Id.*   He also was receiving treatment for neck and spine impairments. *Id.*   Drebes underwent an MRI scan of the brain in June 2017, which revealed an old lesion as well as increased signal in the corpus callosum.  *Id.*   Dr. Greving referred Drebes to a neurologist, Donald K. Hopewell, M.D., after this abnormal brain MRI.  *Id.*   Drebes reported dysesthetic sensations in the hands and feet and brief similar dysesthetic sensations that occur randomly and transiently at various locations throughout the body.  *Id.*   Drebes had remained neurologically stable, other than long-standing memory difficulty.  *Id.*   Dr. Hopewell found that Drebes was a "demyelinating disease suspect" based on his MRI scanning.  *Id.*   He changed Drebes' medication and recommended a repeat MRI.  *Id.*   Drebes returned on August 23, 2017, with complaints of increasing paresthetic and dysesthetic sensations up to his knees.   (Tr. 462.) He underwent an MRI of the brain on August 29, 2017, which revealed multifocal lesions throughout periventricular and subcortical white matter, which was consistent with MS.   (Tr. 467.)   He had two new lesions since his prior MRI, which suggested active demyelization.  *Id.* Dr. Hopewell diagnosed Drebes with MS, and started him on Tecfedara—an oral medication indicated for the treatment of MS.   (Tr. 471.)

On February 28, 2018, Drebes reported he was tolerating his MS medication and his headaches continued to occur daily but were less incapacitating.   (Tr. 684.)   Drebes complained

of an "episodic dysesthetic sensation that he describes like a sensation of being sunburned that will be in a cave distribution and spread down his chest to the upper abdomen."  *Id.*  He indicated that this seemed to occur predominantly when he is either physically or emotionally stressed.  *Id.*  Drebes' neurologic examination was normal "with the exception of a low amplitude rapid postural tremor that improves with rest and volitional activity."  *Id.*  Drebes reported experiencing the tremor for a long period of time, although Dr. Hopewell had not previously observed it.  *Id.*  Dr. Hopewell's assessment was "patient with MS who has had little in the way of clinical symptomatology other than [h]is dysesthetic sensations described above and headache."  (Tr. 685.)  He increased Drebes' dosage of antidepressant medication.  *Id.*  Dr. Hopewell further noted that Drebes' tremor "appears to be enhanced physiologic tremor clinically and it is not really causing any significant functional compromise and we therefore will not use any medications to try to suppress the tremor."  *Id.*  At Drebes' final visit with Dr. Hopewell on May 29, 2018, he complained of increased neck pain, increased headaches, and memory difficulty.  (Tr. 692.)  Drebes' neurologic examination was normal, with the exception of a tremor of both upper extremities that was unchanged from his last visit.  (Tr. 693.)  Dr. Hopewell stated that Drebes was significantly depressed and was having a difficult time dealing with his physical disabilities.  *Id.*  He noted that there may be a neurologic component to this from his MS, but based on his stable MRI scan this was less likely.  *Id.*

The Court finds that the ALJ inappropriately relied on the opinion of a state agency medical consultant in determining Drebes' RFC.  "[B]ecause nonexamining sources have no examining or treating relationship with [the claimant], the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions."  20 C.F.R. § 416.927(c)(3).  *See also Papesh v. Colvin*, 786 F.3d 1126, 1133

(8th Cir. 2015).   "[O]pinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole."   *Lillard v. Berryhill*, 376 F. Supp. 3d 963, 985 (E.D. Mo. 2019).

Here, Dr. Threlkeld provided his opinions based on a review of the record on January 30, 2017.   In his narrative explanation, Dr. Threlkeld summarized the treatment notes of record as well as MRI findings.   (Tr. 80-81.)   He stated that the exam findings have been "normal for motor, sensory and extremities; however, a diagnosis exists for peripheral neuropathy."   (Tr. 80.)   Significantly, Dr. Threlkeld provided his opinions prior to Drebes' diagnosis of MS in August 2017.   (Tr. 467, 471.)   The ALJ addresses the fact that Dr. Threlkeld's opinions precede Drebes' MS diagnosis, but concludes that subsequent records reveal that "clinical findings have not changed significantly."   (Tr. 24.)   The undersigned disagrees that Drebes' subsequent diagnosis of MS and related treatment notes would have no impact on Dr. Threlkeld's opinions. Drebes' diagnosis was confirmed by a brain MRI , after which Drebes received frequent treatment from a neurologist for symptoms of dysesthetic sensations, headaches, and tremor.

The ALJ next indicated that she had given "great weight to the notation of Dr. Hopewell that the claimant's tremors do not cause any significant functional compromise."   (Tr. 25.)   She states that this is consistent with examination findings that are absent of impaired strength, coordination, or dexterity.   *Id.*   The ALJ also stated, as support for discrediting Dr. Greving's opinions, that Dr. Hopewell "noted the claimant's disease produced little clinical symptomatology."   (Tr. 24.)   Drebes argues that the ALJ misstates Dr. Hopewell's findings.

Significantly, Dr. Hopewell did not provide an opinion regarding Drebes' functional limitations.   Although the ALJ accurately conveyed Dr. Hopewell's statement that Drebes' tremor was "not really causing any significant functional compromise," this notation is not

particularly helpful in determining Drebes' ability to function in the workplace.   The fact that
Drebes is not "significantly functionally compromised" does not equate to an ability to
frequently push and pull with the upper extremities during a workday as found by the ALJ.
Further, the ALJ's statement attributed to Dr. Hopewell that Drebes' MS "produced little clinical
symptomatology" omits the remainder of Dr. Hopewell's sentence, "*other than [h]is dysesthetic
sensations described above and headache*."   (Tr. 685; emphasis added.)   Drebes consistently
complained of these symptoms at his visits.

Finally, the ALJ considered Drebes' daily activities and found they were inconsistent
with his allegations of disability.   (Tr. 23.)   She indicated that Drebes' "own admissions suggest
that he is generally capable of engaging in a range of activities consistent with the limitations
stated in the residual functional capacity."   *Id.*   For example, she noted that Drebes
acknowledged he could "perform light household chores, prepare meals and attend to his
personal care without difficulty."   *Id.*   In his Function Report, Drebes stated that he makes
"sandwiches, frozen dinners, [or] small meals" that take him three to five minutes to prepare two
to three days a week.   (Tr. 196.)   Drebes stated that on a good day, he tries to help with light
house cleaning, but has to stop in five to ten minutes due to increased pain.   *Id.*   Drebes did
indicate in his Function Report that he had no problem with self-care.   (Tr. 196.)   The Eighth
Circuit has consistently held the ability to do light housework or prepare food is sufficient to
support a finding that a claimant can perform full-time competitive work.   *KKC ex rel. Stoner v.
Colvin*, 818 F.3d 364, 379 (8th Cir. 2016).   Further, by the time of the hearing, Drebes testified
that his wife has to help him put on socks and tie his shoes and he is no longer able to perform
housework.   (Tr. 51.)   He also testified that he spends most of the typical day either lying down

or seated with his feet elevated.   (Tr. 54.)   Drebes' daily activities—both before and after the

hearing—do not support the ability to perform light work on a full-time basis.

The undersigned finds that the RFC formulated by the ALJ is not supported by

substantial evidence.   The only medical opinion evidence from an examining physician was

proffered by Dr. Greving, who found that Drebes' impairments prevented him from working.

The ALJ rejected Dr. Greving's opinions based on the fact that they were not supported by his

own treatment notes or those of other examining providers.   The Court found that the ALJ did

not err in discrediting Dr. Greving's opinions, because Dr. Greving provided no explanation for

his extreme opinions and his treatment notes did not provide support.   After rejecting this

opinion, the ALJ relied on the opinion of the non-examining state agency physician, Dr.

Threlkeld.   Dr. Threlkeld, however, provided his opinions in January 2017, prior to Drebes'

diagnosis of MS and treatment with Dr. Hopewell.

Social Security Administration Regulations describe MS as follows:

Multiple sclerosis (MS) is a chronic, inflammatory, degenerative disorder that damages
the myelin sheath surrounding the nerve fibers in the brain and spinal cord.   The damage
disrupts the normal transmission of nerve impulses within the brain and between the
brain and other parts of the body, causing impairment in muscle coordination, strength,
balance, sensation, and vision.   There are several forms of MS, ranging from mildly to
highly aggressive.   Milder forms generally involve acute attacks (exacerbations) with
partial or complete recovery from signs and symptoms (remissions).   Aggressive forms
generally exhibit a steady progression of signs and symptoms with few or no remissions.
The effects of all forms vary from person to person.

20 C.F.R. § 404, Subpt. P, App. 1, § 11.00N1 (effective September 29, 2016).

Drebes has sought regular treatment for his MS symptoms both before and after his

diagnosis.   He frequently complains of symptoms of MS, and takes numerous strong

medications for his MS and other impairments.   The undersigned recognizes that the ALJ need

not rely upon the opinion of a particular physician in formulating a claimant's RFC.

Nevertheless, in this case, there is an absence of evidence in the record regarding how Drebes'
MS, in combination with his other impairments, affects his ability to function in the workplace.
In light of the serious and complicated nature of MS, the ALJ had a duty after rejecting Dr.
Greving's opinions to further develop the record to obtain medical evidence regarding Drebes'
limitations.   *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (ALJ has independent
duty to develop the medical record); *Jackson v. Colvin*, No. 4:13-CV-233-NAB, 2013 WL
6571600, at *2 (E.D. Mo. Dec. 13, 2013) (ALJ had duty to develop record where plaintiff was
treated for multiple sclerosis and alleged symptoms consistent with diagnosis).   The ALJ should
have obtained a medical source statement from Dr. Hopewell, ordered a consultative evaluation,
or obtained the services of a medical expert at the hearing to determine the effect of Drebes' MS
and other impairments on his ability to work.

  For the reasons discussed above, the ALJ's RFC determination is not based upon
substantial evidence on the record as a whole, and this matter will be reversed and remanded.
Upon remand, the ALJ shall properly consider the opinion evidence, obtain additional medical
evidence regarding Drebes' limitations, and formulate a new RFC based on the record as a
whole.

         **/s/** Abbie Crites-Leoni
         ABBIE CRITES-LEONI
         UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of September, 2020.